Good morning, Your Honors. May it please the Court, Cara DeVito for Robert Watts. Mr. Watts is in court today. Your Honors, the very narrow question in this appeal is whether Judge Feist properly found by preponderance of the evidence that Mr. Watts acted unlawfully within the allegations of the petition. And I want to draw the Court's attention to the very last alleged incident here, the June 21, 2000 phone conversation in which Mr. Watts said, I will kill everyone at DFCS. I hope the Court recognizes that not only did this comment come at the end of a contentious 10-year relationship between Mr. Watts and the Department, but as the government notes in its appellee's brief at page 17, this specific comment was said in a phone conversation immediately after one of the workers refused to give Mr. Watts a copy of a policy memo which allegedly prevented him from knowing certain things, and after that worker would not even tell him whether his daughter was still in California. It just seems the Department taunted Mr. Watts to an exceptional degree here. How could the Department have control over this child if she wasn't in California? It's a simple thing. Say to him, yes, she's still in California, but I can't tell you where. But they wouldn't even give him the courtesy of that kind of a response. And what is your point? What flows necessarily from that? That these workers who testified they were in fear, and there is no question that they said that, they testified to that, were not reasonably in fear. And thus one of the five elements of California. And why weren't they reasonably in fear? Because if you look at the case law, which says a victim has to have certain knowledge about the person making the threats in order for the threat to be credible, real, immediate and specific, these people had been dealing with Mr. Watts for 10 years, and except for one single incident in 1996 when he hid behind a planter and jumped out at Tom Morris, except for that single incident, for a 10-year period he had confined himself to telephone conversations and letters and postcards to these people, and nothing in his background, nothing that they knew of, is violent. There was no basis for them to be reasonably in fear of him. Well, is your argument basically that because he had not actually physically attacked anyone, you know, actually had not carried out these thoughts over, had not carried out these threats over that period of time, that they shouldn't be afraid?  Well, also the flip side of that is... I mean that they should basically know that he just threatens, that he doesn't really act on them. Yes. They should know he did not have the ability or even the intent to carry through on his threat. There was some testimony by a number of these workers that because the last few threats came in May and June of 2000, that Mr. Watts' behavior was escalating. But the record shows the last one of these such threats was June 21st, and Mr. Watts was not arrested until five weeks later, July 27th or 28th. If his behavior was escalating, one would have expected to see more threats, more letters or something during that five-week period, but there was nothing. Well, it sounds to me as though you're asking us to redo what the district court is required to do. What's the standard of review that we bring to this issue? The standard of review depends. I know I'm doing a tail wagging the dog here, but let us begin with the concept that this was potentially a criminal threat. In which case, Judge Feist looks to whether there is a preponderance of the evidence to sustain those allegations. On review, then, this Court looks to whether there was a preponderance as well, and if not, then Judge Feist clearly erred in sustaining the allegations. If so, he did not, and it's an abuse of discretion standard as to whether or not he should have reimposed a term of supervised release. However, if this was not a question of criminal threats, if the elements of the State statute are not met, then everything else is protected. And why aren't the elements of the State statute not met? Because one of the five elements is not only that the victim, the target, be in fear, but they reasonably be in fear. And Mr. Watts' argument... So you're saying it's unreasonable for them to be in fear because they weren't doing their job right? They were doing a job in such a way that even the district court noted they provoked and taunted Mr. Watts. In addition to which, the court... The worst case I ever studied in torts in law school focused on words is insufficient to justify a physical response. But, Your Honor, this is more than words, however. One worker in particular, Tom Morris, had made it his mission in life. It was his vendetta. The mission of civilization is to do things in a manner that comports with due process, not to respond to a government agency at any level by saying I will kill everybody at the agency. Your Honor, Mr. Morris... So you're saying that we get off then into measuring how well the agency people were doing their job in order to determine whether the I will kill everybody? No, but on review, when considering the preponderance of the evidence, this Court is to look at the overall record. And Mr. Watts' aggressive behavior toward the Department didn't really begin until Mr. Morris sometime in 1996 began proceedings to terminate Mr. Watts' parental rights. That's a substantial trigger. But what... Well, I guess does he have to be... Does he have to be right, do his job correct? He has to be right in that decision to do it in order for your client... I mean, your client can only make a threat against someone that's correctly doing their job, not against someone that's wrongfully doing... Does this statute allow people to threaten people that are not doing their job right? Is there any element there? I guess that's what... No, there's no exception for validated criminal threats. But again, the question is whether this is a criminal threat or whether it was protected First Amendment speech. It's a little bit different than that. When you look at 422, it says a threat even if there is no intent of actually carrying it out, right in the statute. How do you respond to that? Once again, the position, Mr. Watts' position is not that he did not have an intent, although he did not. It's a question of the mindset of the victim, the target. Was their fear reasonable in light of this overall 10-year period and in light of what they knew about the case, what they knew they were doing? Whether they were justified and correct in trying to terminate parental rights or not, shouldn't these workers have had a slightly thicker skin? There was testimony from one of the supervisors, Ms. Inglesby, that people have threatened department workers before. How many of them knew about that one particular threat that was the 2 out of 11 that sent pictures of people in the cemetery and all of that? My understanding is the 2 of 11 was Mr. Morris was the only one who testified to it, so I don't know whether his coworkers knew about it. The cemetery cards, I believe, went to two people rather than just Mr. Morris. But, Your Honors, when you look at the 2 of 11, I know it seems like splitting hairs, but of those people who lost their jobs or became ill or died who were on that list of 11, Mr. Watts had nothing to do with their illnesses or deaths. He was pointing out to these workers that bad things had befallen these people, all of whom had opposed him in some way in this family court proceeding. But he made it very clear in his various letters that he believed God was punishing those people, not himself. He did not even indicate in those letters that he had prayed to God to punish those people. Okay, that's his intent, but what would a reasonable person's intent be when you hear about people dying for their actions? I think that's the issue there, isn't it? What would a reasonable person think? Your Honor, most of these people had not even had face-to-face contact with Mr. Watts. As I said, the only indication in the record that anyone had seen him in person was the incident when he jumped out from behind a planter in 1996. These people are sitting in their offices and receiving letters and phone calls they'd rather not receive, but they haven't been personally or physically threatened by Mr. Watts. So, again, how reasonable is their fear when they work in an office where tempers run high, where you're dealing with people whose social system is so broken they can't take care of their own children in the first place? Well, doesn't that, in a way, inure against Mr. Watts in the sense that there isn't anything, probably, that's more important to most people than their children? And so it's not uncommon for a parent. I mean, most parents would lay down their life for their child, you know, whether they're good or they're bad parents. So I think the underlying basis of this that does involve the custody of a child or taking a child away from someone is precisely the type of situation that reasonable people feel is very volatile. That when you are taking someone's child away, I mean, you talk about their money, you talk about their kids, and anyone that's done family law court knows that that's one of the most explosive courts. So don't reasonable people think that this is the type of thing that, you know, Your Honor, I can't speak to that. Unfortunately, there's nothing in the record from the DCFS workers as to how many people who threaten the department actually follow through on it. I could speculate, but I don't think the court wants me to. I can only tell you that as Mr. Watts became increasingly more frustrated with the system that seemed not only intent on keeping him apart from his child, but severing his parental rights, he began, if you want to regard it as escalating behavior, then yes, it was. But he began to do whatever he could to get their attention, to keep them from severing his parental rights. And to this extent, he succeeded. So what are you asking us to do? Because Mr. Watts is still under a period of, well, at the moment he is free from custody, but he is still subject to supervised release. He's going to be surrendering himself again on April 12th. So to the extent that Judge Feist may have been incorrect in revoking supervised release and imposing a new term of imprisonment plus an extended term of supervised release, Mr. Watts is still subject to a custody restraint. Had Judge Feist not sustained the allegations of the petition for lack of sufficient evidence, Mr. Watts would be free today and would not have to surrender again and serve another four-month term. I'll repeat my question. What are you asking us to do? To reverse the district court's order sustaining the allegations of the petition and to remand this case for a new sentencing hearing. The new sentencing hearing would be on the only allegations of that petition, which Mr. Watts is not contesting because they are different violations. They are grade B violations. When he's resentenced, he will have then served his entire period of time and will not be under any period of supervised release. Thank you, Counsel. Thank you, Your Honor. May it please the Court. Eric Silber on behalf of the United States. As Judge Trott indicated, provocation really in this circumstance would make the fear of the victims unreasonable. It just doesn't relate to that issue. And I think it's important when considering the fear of the victims and whether it's reasonable to look at the statements, particularly in the context and the history of the parties. Turning to Morris first, if you look at the March 30, 2000 call, what precedes the statement is defendant is angry because he's being denied information about his daughter. He says when he's at meetings, I haven't killed anyone today. I would like to kill Tom Morris. He has attitude and he's not cooperative. After getting that phone message relayed to him, on June 19, 2000, Mr. Morris receives a letter from defendant, which contains headstones and internment cards of people who have opposed the defendant, who says this is what happens to assholes who keep fathers and daughters apart. Well, what about the argument, though, that obviously if taken to an extreme, let's say someone every day threatened to kill you, and then after 10 years of every day doing this, you decide I'm going down to the police department and I want a complaint for 422. Well, obviously, there might be an argument at that point that you aren't reasonably unfair because the person has said it every day for the last 10 years and they never did anything, and you know that this is just the way they behave when they don't get their way. Counsel for Mr. Watts is arguing that he's done this with some regularity over a period of time  What do you make of that argument? Well, I think, first and most, it would be a factor to consider in the reasonableness. I don't think itself would be a decisive issue. I don't think if you look at the number of threats or the time period with each individual involved that it approaches the example that you gave. I think if you look at Morris, who had the longest period of time, his involvement with this case actually started in 1996, and the threats that are at issue are in 2000, so it's a 4-year period of time, and he said prior to the threats that are at issue, there were 6-8 threats. So this is not an everyday occurrence. I don't think it's gotten to the point where this is just ridiculous, and I think it's important to look at what the purpose of the statute is, which is to protect people from fear and intimidation. So is it your argument, then, that while you could make that argument, and that could be one interpretation, we're looking at it for substantial evidence? I think that's right. There's another interpretation is what you're saying. I think it's simply one fact for the court to consider in weighing all the evidence in the case, and I don't think it is itself decisive, and here there were a number of facts, including the period of time involved, the nature of the threats, the escalating nature of the threats, because I do think that's an important aspect of it. In the hypothetical that you gave, someone who gives what would appear to be similar threats all the time, maybe over time that would dissipate somewhat, but here the testimony, at least from Morris, was that the threats were escalating, and that actually heightened his fear, and that would be a factor that's reasonable. So I think it all just goes in the mix of what is reasonable, and here the facts bore out the reasonableness, because I think it's important to look at the nature of what this was. This was defendant being denied information. I mean, really, all of the threats that took place in this case were in the context of DCFS doing something to deny defendant something involving his daughter, usually access involving his daughter, and I think it's important to look back at the statements defendant had said over time. I mean, if you take a look at Morris, defendant had said to Morris, if you're standing in my way, I will take you out. Mr. Morris's interpretation was that defendant was obsessed with the child custody matter. Defendant himself, when he was testifying, indicated he could not be objective about this child custody matter. I think when you view that in the context that if you're opposing defendant in the child custody matter, he will take you out, these threats take on a much more serious overtone, because they're all in relation to defendant being denied information. I mean, when you turn to the March 30, 2000 threat, the threat is made immediately after he's denied information about the whereabouts of his daughter. It was an angry response. That's what Inglesby testified. The entire conversation was angry, but particularly the statement that was the threat. Again, if you turn to the letters on June 19, 2000, that came after a child custody hearing. Now, the record doesn't indicate exactly what happened at the hearing, but defendant's letter to the judge indicates that he lost the petition that was filed. That's when you get the letters that are sent both to Morris and Eisner at that point, which talk about opposing him. I mean, I think Morris testified that what made him afraid is what this, this is what happens to assholes who keep fathers and daughters apart. Part of that was his context with defendant in the past, in which defendant said, as I mentioned, that if you're standing in my way, I will take you out. That indicated to him that that was the action that the defendant... Well, didn't Morris also warn Watts that he took the threat seriously? And Watts said, that's exactly what I intend, that you take these threats seriously. That's exactly right. And not only that, defendant also said, this is a promise, not a threat. And I think in that context, when an offendant has specifically told a victim that, I don't think it is unreasonable for the victim to, in fact, be in fear. I mean, I think all these circumstances come into play in this case and make the victim's fear reasonable. From the hearing itself, because there were different threats that were testified to during the hearing and different, more than one witness, correct? That's correct. What evidence, is the evidence just individual to each count, what that person said, or is there evidence that can be considered as to other counts in the court coming to its conclusion? Well, I think it's permissible, as the California court indicated in Stansfield, when you're looking at, for example, Morris, to consider all of the threats as to Morris together and weigh one threat against another. Because in that case, there was a suggestion that, well, maybe one of the earlier threats wasn't taken that seriously. And the court said, well, certainly the later threats enhanced the reasonableness of the fear of the threats in that case. I mean, the later ones made the earlier ones seem more fearful. I think there wasn't evidence presented that you can look at the threats to Morris and consider that for Eisner, or you can look at the, in that context, except with one exception, that Eisner said that she went after she got her threat and spoke to Judge Nash. And Judge Nash told her that he too had been threatened. And I do think it's appropriate in that context to weigh that fact. She gets the letter with the internment cards and the pictures of the gravestones. She is scared from it. In particular, the phrase, we're praying you're dying. In addition to the idea that it had personal information of the attorney, Stanley Cohen. I mean, she was concerned that he'd obtained this personal information and it led her to believe that he might be able to do the same thing about her. After receiving that, she talked to the judge in the case. Judge Nash, and he said he was threatened too. And I think that enhances the reasonableness of the fear. How many grade A violations did Judge Feees find? He found that there were, well, I think there was some dispute in the district court about, or at least there was an agreement between the parties about whether stalking was a grade A or a grade B. I think it is undisputed now that it is a grade B. In the district court, the probation office said it was a grade B. The government said it was a grade A. The district court never commented on the matter. So how many grade A violations are we dealing with? We're dealing with four in this case. Four? Is it sufficient that if any one of those is supported to utilize the grade A violation range? Yes, I think that's correct because even, all you need to do, all that needs to be done on appeal is for the defendant to be within that range. I think at that point then the sentence is appropriate because even if the other threats didn't constitute violations in and of themselves, the district court would properly consider the facts of those threats. Really the only question is whether the defendant was properly within the grade A range and one violation will place the defendant in the grade A range. It seems to be what 71.1b suggests where there's more than one violation, you take the most serious one and that fixes the range. I think that's right. I think that's ultimately the focus of both parties has been if there is a single grade A violation that the district court should be affirmed in this case. Thank you counsel. Do you have anything else? No. On that the government submits. You can respond if you care to. Judge Trott I just wanted to address your comment that Mr. Morris had been told by Mr. Watts that Mr. Watts wanted Mr. Morris to take the threats seriously. But Mr. Morris also testified that Mr. Watts said that to him repeatedly over a period of time. The record is not clear as to what period of time it was. But the two men had this contentious relationship from 1996 on. And so although Mr. Watts may have told Mr. Morris repeatedly I want you to take my threats seriously. He had been saying so over a number of months if not years and yet hadn't progressed beyond threats. Thank you Your Honor. Thank you counsel. The case disargued is ordered and submitted. We'll go on to the next case United States v. Alfredo Flores Barajas. The case is ordered and submitted.
judges: Trott, Callahan, Magill